Commonwealth *v.* Brewer, Appellant.

Argued April 24, 1933.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Thomas I. Guerin,* for appellant.

*Earl Jay Gratz,* Assistant District Attorney, and with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by James, J., July 14, 1933:

Appellant was indicted in the court of quarter sessions of Philadelphia County on four bills of indictment, charging him with (1) attempted extortion, (2) conspiracy to extort, (3) false personation, (4) false imprisonment. At the trial, upon conclusion of the testimony, defendant presented a point as to each of the indictments, to-wit, that under all the evidence, the verdict should be not guilty. The trial judge directed a verdict of not guilty on the indictments charging extortion and conspiracy to extort, but submitted the indictments of false personation and false imprisonment which resulted in a verdict of guilty on both indictments.

In view of the conclusion which we have reached, it is unnecessary for us to consider and discuss any of the questions raised on behalf of appellant except whether or not the testimony was sufficient to justify the conviction under the indictments.

The indictment for false personation contained two counts: The first count alleged that the appellant "did then and there falsely represent himself to be and then and there falsely assume to act as a detective officer of the City of Philadelphia, to-wit, as a detective of the Department of Public Safety of said City of Philadelphia;" the second count in the indictment charged that he "did falsely personate, by badge, insignia and otherwise, an officer of the Department of Public Safety of the City of Philadelphia in the State of Pennsylvania."

The first count in this indictment was drawn under the Act of May 5, 1897, P. L. 39, Section 1, which Act

reads as follows: "That ...... every person within the Commonwealth of Pennsylvania who falsely represents himself to be or who falsely assumes to act as a detective or any elective or appointive officer of the Commonwealth of Pennsylvania, or of any county, municipality, city, borough, township, district or ward within the Commonwealth of Pennsylvania, shall be guilty of a misdemeanor, ......"

The second count of this indictment was drawn under the City Charter Act of 1919, P. L. 581, Art. V, Sec. 5, which provides as follows: "It shall be a misdemeanor, punishable by fine not exceeding five hundred dollars, or imprisonment not exceeding six months, or both, in the discretion of the Court, for any person falsely to personate, by uniform, insignia, or otherwise, any officer or member of the department."

In appellee's argument, it was conceded that since appellant did not use a uniform, insignia or badge, the testimony may have been inadequate to support a conviction on the second count for the violation of the Act of 1919, so that our discussion will be confined to whether the testimony was sufficient to support a conviction on the first count of the indictment.

The testimony shows that the private prosecutor, Benjamin Cutler, had been arrested five years before on the charge of circulating obscene literature; that on May 9, 1932, the appellant and another man named Carlin came to Cutler's place of business at 72 North Fourth Street, Philadelphia, and that the appellant remained near the doorway while Carlin walked to Cutler's desk and, according to Cutler's testimony, "Mr. Carlin represented himself as being an agent of the Department of Justice and told me briefly—" when he was interrupted and later examined by the Court as follows: (Page 10a) "Q. What did Carlin say to you?' A. He said he had known I had opened

here two months ago, and he also had known that I was arrested about five years ago and he came down to investigate my business. I told him it was perfectly all right, if he wanted to go back, wanted to go in the office, I would be glad to show him anything he wanted to see and answer any questions he wanted to ask. He said he wasn't interested to see or ask anything there, and he suggested I go with him over to his office at 9th and Market Streets. Of course, I got my hat and coat and I walked out with the other gentleman and this gentleman'' (meaning appellant). The private prosecutor testified, upon interrogation by the court: (Page 9a) ''Q. Was this man (appellant) in the store? A. Probably—oh, he was in the store, yes, sir. Q. How far from you? A. He might have been—if we walked back he was probably three or four yards.'' On direct examination, prosecutor testified: (Page 10a) ''Q. The three of you together? A. Yes, sir, over to 9th and Market Streets. When we got to 9th and Market Streets they were not, of course, anxious to take me to any particular place within the building—By the Court: Q. They took you to the Post Office Building? A. Yes, downstairs in the corridor. We were talking there to and fro. Q. The three of you talking? A. Yes. Q. Did he introduce you to the other man by that time?'' (Page 11a) ''A. Carlin gave me the impression that this man was the local detective and he was the Federal Agent. Over there they seemed to have changed their minds and they were not anxious to take me anywhere and they walked me on toward City Hall.'' On cross examination, the private prosecutor testified: (Page 15a) ''Q. When these two men came in the door isn't it a fact that Carlin alone approached you? A. That is right. Q. This man stayed over by the door, isn't that right? A. Yes, sir. Q. Took no part in the con-

versation whatever? A. No, I think Carlin did practically all the talking. Q. You were not talking very loud, were you? A. No, sir. Q. Talking in very low tones? A. Ordinary. Q. It was a matter that was a rather secret matter and unpleasant matter? A. That is right. (Page 16a) Q. If you were talking to Carlin in low tones and were then at your office or desk, and the defendant Brewer was at the front door, is it likely that your conversation would have been overheard by this defendant? A. That I couldn't say positively;...... Q. You were not talking loud enough to be overheard? A. We were not talking loud. Q. Purposely talking in low voices? A. Yes, sir. Q. Brewer said nothing at all to you in the store, did he? A. No, sir. Q. Made no statement of any kind to you? A. No, sir. Q. No threats of any nature whatever? A. No, sir." This is all of the testimony in the record bearing upon any representation or personation made by the appellant.

Nowhere in the record does it appear that anything was said by the appellant that he represented or held himself out to be a detective officer of the City of Philadelphia, to-wit, as a detective of the Department of Public Safety of said City of Philadelphia, or any elective or appointive officer of the Commonwealth of Pennsylvania or of any of the political divisions as set forth in the Act of 1919. The only testimony indicating that appellant was an officer of any character was the statement made by the prosecutor that "Carlin gave me the impression that this man was a local detective." Whether this impression was from words spoken or merely from Carlin's attitude or whether the statements made by Carlin were heard by appellant does not appear. Something more than impressions not founded on any act of the appellant must be established to convict one of falsely representing. He did not use a badge, insignia or uniform,

nor does the record establish one single statement made by the appellant or his alleged confederate in his presence that he represented or assumed to be a detective officer of the City of Philadelphia. We find the record barren of any statements made by the defendant or made by his alleged confederate in his presence which would justify the assumption that he was falsely representing himself as a public officer of any character. From our examination of the record we find no testimony which would justify a conviction under the indictment for false personation.

The indictment for false imprisonment charges that appellant "in and upon one Benjamin Cutler...... unlawfully, wilfully and maliciously did make an assault and......did unlawfully imprison and detain the said Benjamin Cutler then and there imprison for a long period of time, to-wit, for the period of one hour then next following." The pertinent testimony relating to the charge of false imprisonment begins in the testimony of Cutler when Carlin came in to investigate the business, which testimony is as follows: (Page 10a) "A. ......He said he wasn't interested to see or ask anything there, and he suggested I go with him over to his office at 9th and Market Streets. Of course, I got my hat and coat and I walked out with the other gentleman and this gentleman" (meaning appellant). "Q. The three of you together? A. Yes, sir, over to 9th and Market Streets. When we got to 9th and Market Streets they were not, of course, anxious to take me to any particular place within the building—By the Court: Q. They took you to the Post Office Building? A. Yes, downstairs in the corridor. We were talking there to and fro. Q. The three of you talking? A. Yes." (Page 11a) "And they were not anxious to take me anywhere and they walked me on toward City Hall. Q. Up Market Street? A. Yes, sir. By that time I about made up

my mind they were just impersonators. Of course, I tried in talking to them to talk myself away, to try to get away from them as soon as I could. We walked toward City Hall and then back toward the City Hall Annex and finally we made an appointment or they made an appointment with me. I was to meet them and they gave me about an hour or an hour and a half time. I was to meet them at the Benjamin Franklin Hotel.'' (Page 12a) ''Q. They didn't take you any place at all? A. No.'' (Page 16a) ''Q. Brewer said nothing at all to you in the store, did he? A. No, sir. Q. Made no statement of any kind to you? A. No, sir. Q. No threats of any nature whatever? A. No, sir.'' (Page 17a) ''Q. What, if anything, did Brewer do as you walked out Market Street; didn't do anything to you, did he, didn't hold your arm or lay any part of his hands upon your body? A. No, but I walked between them. Q. You walked between them all the time you were talking to Carlin? A. Yes, sir. Q. Talking in a low voice to Carlin? A. Yes, sir.'' (Page 18a) ''Q. What did Brewer say, if anything, did he join at all......in the conversation? A. Before I left he may have said, 'See if you can't straighten this out between you.' When I say that Carlin did practically all the talking, I mean Carlin did 90 to 95 per cent of the talking. Q. Brewer just accompanied you? A. Yes, sir.'' (Page 20a) ''Q. You were not told you were under arrest, were you? A. I wasn't told exactly, but I felt I was; I took it for granted. Q. In the office Carlin told you you were under arrest, did he? A. Not in that many words.'' (Page 21a) ''Q. Was any warrant exhibited to you? A. No, sir. Q. To take you away from your place of business? A. Carlin showed me his shield in a leather case. Q. A shield or insignia of a shield in a leather case? A. Yes, sir. Q. Where did he show you that? A. In my building. Q. Right in the store? A. Yes, sir.''

Appellant contends that the conviction under the indictment for false imprisonment should be set aside for two reasons, (1) because false imprisonment is not an indictable offense, and (2) because there was no evidence sufficient to justify the conviction on the charge of false imprisonment.

The crime of false imprisonment has never been defined or punished as a distinct crime by any statute of Pennsylvania and as was said by counsel for appellant we have been unable to find any reported cases within this jurisdiction where any person has been indicted and sentenced for a false imprisonment. However, we do find sufficient authority both from textbooks and reported decisions in other states to hold that false imprisonment is an indictable offense at common law.

In 3 Blackstone's Comm. 127, we find, "We are next to consider the violation of the right of personal liberty. This is effected by the injury of false imprisonment, for which the law has not only decreed a punishment, as a heinous public crime, but has also given a private reparation to the party...... To constitute the injury of false imprisonment there are two points requisite; (1) the detention of the person; and, (2) the unlawfulness of such detention."

In 4 Blackstone's Comm. 218, we find, "The two remaining crimes and offences against the persons of his majesty's subjects are infringements of their natural liberty; concerning the first of which, false imprisonment, its nature and incidents, I must content myself with referring the student to what was observed in the preceding volume, when we considered it as a mere civil injury. But, besides the private satisfaction given to the individual by action, the law also demands public vengeance for the breach of the king's peace, for the loss which the state sustains by the confinement of one of its members, and for the infringement of the good order of society."

In 11 R. C. L. 792, we find that "A false imprisonment necessarily constitutes or includes a common law assault, and may be prosecuted as such." See also Clark's Criminal Law, 1894, at page 218, and May's Criminal Law, Sec. 240.

In 25 C. J. 571, where the authorities of the various states are collected, the general definition and nature of the injury of false imprisonment is set forth as follows: "False imprisonment was indictable. as a specific crime at common law. It is also made a crime by statute in many jurisdictions. The gist of the offense is the actual and unlawful restraint or detention of one person against his will by another, by actual force or reasonably apprehended force, though actual force is not necessary. The mere fact that a person considers himself under arrest is not sufficient."

In view of the above we have no hesitancy in holding that false imprisonment is indictable as a distinct and separate offense under the common law. The common law of England having been adopted as part of our judicial system, an indictment for false imprisonment will be sustained.

In order to constitute the injury of false imprisonment the two requisites are: (1) the detention of the person; and, (2) the unlawfulness of such detention: Lentz v. Raum, 59 Pa. Superior Ct. 260.

From an examination of the record, we are unable to find testimony sufficient to establish that the private prosecutor was detained or held under restraint by actual force, threatened force or reasonably apprehended force on the part of the appellant. Cutler was not even told by Carlin that he was under arrest; in fact, Cutler willingly left his own office to go to Carlin's "office" merely at the *suggestion* of Carlin and not by reason of an order or threat by Carlin. There is no testimony in the record from which it

was established that the conversation had between Carlin and Cutler was heard by the appellant so as to charge him with knowledge of their mission when they left Cutler's place of business. The strongest testimony on the question of the arrest was Cutler's statement that he "felt" he was under arrest. What his own impressions were or what he believed, unless his belief was induced by some statement or act on the part of the appellant that would justify such a feeling, would not be sufficient upon which to base a conviction that he was being detained or restrained by the appellant. The whole record, instead of establishing that there was any unlawful restraint of the private prosecutor, shows clearly a willingness and a voluntary act on the part of the prosecutor and an acquiescence at the mere suggestion of Carlin that he should go to the place of business of Carlin. From this record, we find no evidence that Cutler was placed under arrest or detention or that he was told he was under arrest or detention, or that he had reasonable cause to believe that he was under arrest by any act of the appellant. In view of our opinion, we believe there was not sufficient testimony to justify a conviction for false imprisonment.

The first and second assignments of error in the appeal to No. 174 October Term, 1933 upon the bill of indictment charging false personation are sustained; the first and second assignments of error in the appeal to No. 175 October Term, 1933 upon the bill of indictment charging false imprisonment are sustained. It is not necessary to pass on the remaining assignments of error in either case. The judgments of conviction at Nos. 174 and 175 October Term, 1933 are reversed and it is ordered that the defendant be discharged.